UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

LYNN LUMBARD, ANITA YU, JOHN BOYER
and MARY RAAB, individually and on behalf
of all others similarly situated,

|  |  |  |
|---|---|---|
|  | Plaintiffs, | **CLASS ACTION COMPLAINT** |
| vs. |  |  |
|  |  | Civil Action No. <u>5:17-cv-13428</u> |
| THE CITY OF ANN ARBOR, |  |  |
|  | Defendant. |  |

Plaintiffs Lynn Lumbard, Anita Yu, John Boyer and Mary Raab, on their own behalf and on behalf of all other persons similarly situated (hereinafter "Plaintiffs"), in support of this Class Action Complaint against the City of Ann Arbor (hereinafter, the "City"), allege as follows:

## PRELIMINARY STATEMENT

1.     This is an action against the City of Ann Arbor pursuant to the Fifth and Fourteenth Amendments to the United States Constitution arising from the City's initiation and implementation of a program of takings of private residential property by means of physical invasions and permanent physical occupations, known as "footing drain disconnections" ("FDD's") under the City of Ann Arbor "Footing Drain Disconnection Program" ("FDDP"), all as fully set forth in this Complaint.

2.     The mandatory FDDs, and the resulting takings of Plaintiffs' private property and deprivation of their rights to the exclusive use and occupation of their homes, were initiated and completed without any steps taken by the City toward condemnation proceedings under Michigan law, including the payment of just compensation.

3.     The Ann Arbor City Council, in Ordinance No. 32-01 in 2001 (the "Ordinance"), stated the public purposes of the FDDP to be the lessening of storm water and groundwater drainage from residences into the City's sewer system to reduce backups from the City sewers and overflows from the sewer system at the City's wastewater treatment plant into the Huron River.

4.     FDD's consist of mandatory inspections and entries by City employees, City officials and the City's outside contractors for demolition, excavation and construction inside and outside Plaintiffs' houses. The FDDs at Plaintiffs houses all included permanent installations of operating hydraulic and electrical equipment, pipes, pumps, electrical wires, external drainage collectors, switches, attachment devices and other components.

5.     The City's mandatory FDD construction disabled the functioning systems for storm water drainage designed and built into the Plaintiffs' houses between 1946 and 1973, as required by applicable codes and the permits issued thereunder at the time.

6.    The City's FDD mandatory construction replaced these systems with the City's own "one-size-fits-all" design for drainage of storm water away from the houses, basements and crawl spaces.

7.    The City designed a different physical system and route for storm water drainage; substituted electricity for gravity as the energy source for the drainage system; collected storm water inside the basement, rather than outside the basement, as built and permitted; directed water to a special collection system near the street, not to the existing as-built combined house sewer lead below the foundation; and drained the storm water discharge in the street at ground level, rather than to the as-built and as-permitted discharge to the City sewer system, safely below foundation level.

8.    The City's FDD construction permanently occupies significant areas of the houses, inside and out.  Schematic drawings show the areas of houses occupied permanently by physical FDD construction, equipment and piping for the Plaintiffs' houses extending from a point in the basement or crawlspace of each house and extending to the exterior of the house, across the deck or front yard and into a drainage device in the lawn extension.

9.    The construction at all houses included piercing of the building envelope at street level; the running of interior pipe for  up to 25 feet or more and

external trenching or drilling across front yards or back yards for drainage piping runs, up to 75 feet at the home of Plaintiffs Boyer and Raab's.

10.    The City had chosen FDDs over traditional engineering methods as a means of settling an administrative enforcement case commenced against the City the predecessor agency of the Michigan Department of Environmental Quality ("MDEQ") sometime between 1998 and 2000.

11.    The case was commenced under the enforcement provisions of the Michigan Natural Resources And Environmental Protection Act, MCL § 324.3101 *et seq*. ("NREPA") pertaining to abatement and control of "combined sewer overflows" from the parts of the City's sewer system consisting of or including combined sewers. MDEQ acts pursuant to a delegation of enforcement by the United States Environmental Protection ("EPA") under the Clean Water Act Amendments of 1972 ("CWA").

12.    MDEQ alleged, inter alia, violations by the City of NREPA (and thus the CWA) due to massive overflows of combined sewage at the City's Wastewater Treatment Plant ("WWTP") into the Huron River from the City's combined sewer system components.

13.    The combined sewers in this case are typical of other cities in the Great Lakes Basin, such as Grand Rapids and Lansing in that they were designed and constructed in the same general manner to accept storm water runoff and as a

component of combined sewage wastewater (including sanitary wastewater) from buildings, including all of the Plaintiffs' houses.

14.     MDEQ alleged that the City's sewer system, due to growth, development and the resulting sewer inflows, was no longer adequate for its then-immediate or future needs for prevention of overflows of untreated combined sewage water surcharging of the City's combined sewers and overwhelming the capacity for treatment at the Ann Arbor Waste Water Treatment Plant ("WWTP"). Such overflows of combined sewage are defined by MDEQ and EPA as "Combined Sewer Overflows" or "CSO's."

15.     The terms "combined sewer overflow" and "CSO" should not be confused with the terms "sanitary sewer overflows" or "SSO's," a term that only applies to overflows from separate sanitary sewers.

16.     In 2003 the City and MDEQ entered into an Administrative Consent Order settling and memorializing the enforcement case (the "ACO," a copy of which is attached hereto as **Exhibit "1"**), including stipulations and findings of fact and law concerning the City's CSO non-compliance.  The City of Ann Arbor paid a fine of $7,500.00 for CSO's from 1997 through 2002.

17.     The City had until a date in 2003 to conclude the MDEQ enforcement case based on FDD's as the "primary means" for abatement of its violations of the CSO provisions of NREPA.

18.     If it did not, it faced the imposition of conditions requiring non-FDD based long-term abatement for CSO's, including requirements by traditional engineering solutions the City had rejected for years.

19.     MDEQ signed the ACO in time for the City to proceed, instead, with FDD's as the primary element of its long term plan for CSO abatement.

20.     At the time the City entered into the ACO with MDEQ, as set forth in Paragraph 16, *infra*, the City of Ann Arbor knew that FDDs represented a new and unproven technology for which inadequate data existed as to its effectiveness.

21.     For purposes of implementing the mandatory inspections, construction and installations of FDDs in Plaintiffs' homes, the City clothed with authority one contractor for engineering, "construction management," and "public engagement," and approximately five other hand-picked and "pre-qualified" installation and construction contractors to perform the actual FDD's.

22.     The nature of the FDDs at the Plaintiffs' homes was destructive; they were unscientific in their design and implementation.  According to the Michigan Bureau of Construction Codes on November 7, 2014, FDD construction was not subject to state construction codes or building codes of any kind, impermissibly depriving owners of FDD houses of the basic protection of such codes that applies to any other type of residential construction.

23.     The FDDs destroyed the foundation drainage system at houses that had been constructed decades ago and appeared to be functioning as designed and replaced it with a system of unwanted operating equipment, inside and outside their homes, that is burdensome, costly, unsafe, noisy and incompatible with the peace of mind and comfort the Plaintiffs enjoyed.

24.     The FDDs were performed against the will of the Plaintiffs, beginning in 2001. The City enforced its asserted right to require targeted residents to undergo FDDs by threatening financial penalties, disconnection from all City and water services, potential sewer liens and, possibly, the eventual loss of their homes.

25.     The Plaintiffs herein seek an award of just compensation for the permanent physical occupations of their houses by the City, after active physical invasion.as hereinafter set forth, and any necessary injunctive and declaratory relief in connection with the implementation of such award.

26.     The takings at the Plaintiffs' houses are of a continuing nature.

27.     The takings at the Plaintiffs' houses have not stabilized.

28.     The Plaintiffs herein are entitled to the procedural protections for plaintiffs alleging permanent physical occupations of real property set forth in *Loretto v. Teleprompter Manhattan CATV*, 458 U.S. 519 (1982), including the exclusion of evidence of public purpose or public benefit.

## THE PARTIES

29.    Plaintiff, Lynn Lumbard, resides, and at all times hereinafter mentioned, resided at 1515 Avondale Avenue, Ann Arbor, MI 48103 in a home constructed in 1955.  During all times relevant hereto, Plaintiff Lynn Lumbard has been the fee simple owner of the home.

30.    Plaintiff, Anita Yu, resides at 2362 Georgetown Boulevard, in a home she has owned since 1970, in Ward 1 of the City of Ann Arbor.

31.    Plaintiffs, John Boyer and Mary Jean Raab, reside at 2273 Delaware , in a home which they have owned since 1970, located in Ward 4 of the City of Ann Arbor.

32.    The City is a municipal corporation, organized and existing under the laws of the State of Michigan, with an office for the transaction of business located at Larcom City Hall, 301 East Huron Street, Ann Arbor, Michigan 48104.

## JURISDICTION AND VENUE

33.    The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331.  As set forth in Paragraphs 150 through 168, below, the Plaintiffs' claims are ripe for review in federal court under *Williamson County Regulatory Planning Commission v. Hamilton Bank*, 473 U.S. 172 (1985).

34.    Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(c).

## FACTS COMMON TO ALL COUNTS

**A.     The City of Ann Arbor.**

35.     The City is located in the State of Michigan and is the county seat of Washtenaw County, home of the University of Michigan.  Upon information and belief, the City was founded in 1824 and currently has a population of approximately 115,000 people, making it the fifth largest city in the State of Michigan.

36.     The City is governed by a City Council that has eleven voting members: the mayor and ten City Council members.  The City is divided into five wards, each of which elects two City Council members.  The mayor is elected city-wide and is the presiding officer of the City Council.  The City Attorney reports only to the City Council.

**B.     The Plaintiffs' Vested Property Rights.**

37.     All of the Plaintiffs' houses were built between 1947 and 1973 located in the Southwest and Northeast quadrants of the City in areas including low elevations relative to other parts of Ann Arbor.

38.     The City has known at all times relevant hereto that these areas have historically high ground water levels even in dry weather and a history of flooding in heavy rain events. For example, the Lansdowne I vicinity near Michigan Stadium had a large swimming pond in the middle of the area (known at the time

as "the Cow Pond") because of heavy runoff and groundwater problems during even normal spring rains.

39.    By the 1960's, the City of Ann Arbor had experienced significant population growth and corresponding development, which continued.  In 1960, the population was less than 68,000.  By July 2000, the City population was over 114,000.

40.    Upon information and belief, the condition, capacity and types of its publicly owned and controlled sewage infrastructure did not keep pace with the rate of development.  Parts of the City's sewer system were built in the 1920's. The WWTP was originally constructed in 1936.

41.    Prior to November 1973, the City had approved plats for the subdivisions where the Plaintiffs' houses are located.  This included three phases each for the Lansdowne and Churchill Downs developments in the southwest and for the Orchard Hills and Bromley neighborhoods in the northeast.

42.    As required by law and codes in effect at the time, as a health and safety measure to protect against basement storm water seepage and flooding, all of the Plaintiffs' houses were designed and built with a drainage system to collect groundwater from storms or thaws, which seeps down from ground level and down the external walls by gravity into the foundation drain tiles (also known as "footing

drains") excavated and laid safely on the other side of the external basement foundation wall, below basement level.

43.     Attached to this Complaint as **Exhibit "2"** is a City of Ann Arbor drawing of the internal and external sewer connections of a "typical Ann Arbor house," leading to a City combined sewer and from there to the WWTP.  The drawing appeared in the April 2000 issue of Waterways, a City publication mailed to all water utility customers (the "2000 City Sewer Drawing").

44.     On information and belief, all of the Plaintiffs' houses, and those of others similarly situated, had typical sewer connections for storm water and wastewater, including sanitary sewage.

45.     As shown near the bottom of the 2000 City Sewer Drawing, as the foundation drain tiles in the house's as-built system fill, the collected storm water and groundwater flows by gravity drain into a pipe under the basement floor known as a "combined sewer lateral." The combined sewer lateral and its inflows, including sanitary waste, are shown near the footing drain flow into the combined house sewer lateral depicted near the bottom of the Drawing.

46.     Also as shown on the City's 2000 drawing, the combined sewer lateral still typically drained by gravity from the combined sewer lateral which traverses the lawn area in the front of the house, and to a tap into the combined sewer in the street.

47.    The combined sewer was intended to accept storm water from the house's foundation drains as a component of the combined contents of the house sewer lateral, defined by EPA as "combined sewage."

48.    Upon information and belief, the Plaintiffs' homes timely passed their City building code inspections, of every type, and received Certificates of Occupancy from the City and were otherwise allowed to be constructed and occupied.

49.    Further, in October 1973, the Ann Arbor City Council enacted Ann Arbor Ordinance 8-73, a copy of which is attached hereto as **Exhibit "3**.**"** Ordinance 8-73 grandfathered all the Plaintiffs' houses from new requirements (i) for drainage of all storm water in new subdivisions, including runoff and from connected footing drain systems, into the new separate, fully enclosed storm sewers and (ii) its new prohibition against the discharge of storm water into a sanitary sewer after its effective date in November 1973.

50.    The Plaintiffs, therefore, were intended to be protected against a future City administration or City Council purporting to require them to separate their storm water flows collected in their existing foundation drains from their combined sewage in the combined house sewer lateral.

51.     Ordinance 8-73 was also consistent with the vested property rights the City had created under state laws by permitting construction, occupation and use by the Plaintiffs' of their homes.

52.     Notwithstanding the foregoing, the City's implementation of the FDD Program before and after enactment of the FDD Ordinance targeted *exclusively or almost exclusively* those very homes permitted before November 1973.

## C.     Combined Sewer Overflows.

53.     Heavy rain events in Ann Arbor from March 1997 through July 2000 resulted in surcharging (over-capacity conditions) in the Ann Arbor public sewer system. This resulted, *inter alia*, in massive CSO's into the Huron River, including the contaminated storm water runoff combined with untreated or partially treated sewage in the combined sewer portion of the City's sewer system.

54.     For example, on August 6, 1998, the City allowed a CSO of 168,000 gallons of combined sewage to "bypass" treatment at the WWTP and discharge at "Outfall No. 4" into the Huron River, a location away from the WWTP.

55.     On April 23-24, 1999, the City allowed a CSO of 1,200,000 gallons of combined contaminated storm water and domestic sewage due in large part, on information and belief, to surcharged conditions in the City's combined sewers.

56.     During this period, the surcharged conditions in the City sewers caused combined sewage and storm water backups at approximately 200 private

residences within the City of Ann Arbor, many of which occurred in the City's Bromley, Dartmoor, Glen Leven, Morehead, and Orchard Hills Sewer Districts where, on information and belief, all or almost all of the City's public sewers are combined sewers.

57.    In its FDDP literature and public materials the City placed the number of houses with typical connections as depicted in the 2000 City Sewer Drawing (Exhibit 2) at 20,000.

58.    As of June 5, 2017, the official position of the City of Ann Arbor Water Utilities Director is that it has never had and does not operate any combined sewers.

59.    The City's former Water Utilities Director, Sumedh Bahl, however, testified under oath at a deposition in 2015 that the City operates a "wet sanitary" sewer system.

60.    Attached to this Complaint as **Exhibit "4"** is a Washtenaw County official storm drain map of the City of Ann Arbor issued in 2016, including both County and City storm sewers ("County Storm Drain Map).  The two circled areas on the map are the areas are where all or nearly all of the Plaintiffs' houses are located.

61.     As shown on the County Storm Sewer Map, there are no separate City storm sewers in those areas.  In contrast, the center of the City has had extensive separate storm sewer construction.

62.     According to MDEQ in 2007, "wet sanitary" sewers are classified as "combined sewers."

63.     The City had previously failed to construct separate and functioning storm drains for storm water in the areas where Plaintiffs homes are located due to (i) the anticipated capital expenditures and rate increases which would be necessary to separate its combined sewer infrastructure and (ii) the fact that Ordinance 8-73 grandfathered all such homes against changes in their as-built connected footing drain systems.

64.     By grandfathering the Plaintiffs' houses, the City had effectively banned future FDD's at least as to pre-November 1973 residences.

**D.     The Task Force Proposes Footing Drain Disconnections as Part of the "Possible Solution" to the Surcharged Sewage System.**

65.     In response to some residents' complaints about sewer backups, and likely in response to MDEQ's enforcement action described in the ACO (Exhibit "1") discussed at ¶¶ 15-17 of this Complaint, the Ann Arbor City Council, by Resolution 381-7-99 on July 6, 1999, approved the formation of "an advisory task force to develop solutions to minimize impact of sanitary sewer backup" (hereinafter, the "Task Force").  The Task Force membership had been selected by

City employees and officials and included numerous representatives of the City, environmental groups, City consultants and Washtenaw County officials.

66.    Such Resolution called for an "engineering professional" on the Task Force.   In early 2000, the City contracted with Camp Dresser McKee, Inc. ("CDMI") to fill that role.

67.    The Task Force was instructed to "present possible solutions with funding options to the City Council within 18 months," that is, by January 6, 2001.

68.    As part of the Task Force process, a series of public meetings was organized and managed by the City and CDMI, as were meetings for the City Council and the City Planning Commission.

69.    Periodic newsletters were disseminated with the stated purpose of keeping the public informed on the work of the Task Force.   These newsletters were authored by CDMI representatives and/or City staff.

70.    The October 2000 Task Force Newsletter ("Task Force Newsletter No. 3") discussed, for the first time as part of a "possible solution" to the basement backup problem, an idea "to remove flows from foundation drains in individual homes," namely, FDDs.

71.    The January 2001 Task Force Newsletter ("Task Force Newsletter No. 4") stated that the Bromley, Dartmoor, Glen Leven, Morehead and Orchard Hills Sewer Districts were the City's sewer backup "problem areas."

72.     The Task Force reported to the public in the same document that the overall "recommendation" of the Task Force was for a program including FDD's in 1,325 homes, even though the Task Force was clearly forewarned by the date of Task Force Newsletter No. 4 that FDDs were an unproven technology.

73.     At page 2 of Task Force Newsletter No. 4, the Task Force (in reporting on common questions at public meetings), included the following Q&A:

> [Question:] The Task Force says there is less 'certainty' about the 'footing drain disconnect' solution. Why?
>
> [Answer:] *We have less than complete data on the amount of wet weather flow from the foundation footing drains that gets into the sewer system during storms.*  Instituting this alternative as a solution will include additional work to complete the data collection <u>to bring the same higher level of certainty as the other solutions</u>.  Since all of the alternatives include footing drain disconnection at homes that have previously flooded, flow data collection from these locations will be used to increase the confidence in the flow projections.  If the newly collected data does not increase our level of certainty about this remedy, the Task Force would recommend different protection measures for the neighborhood.  *Additionally, this is a fairly new approach to dealing with flooding problems.*  It will require significant cooperation from homeowners, some of whom have not experienced flooding.  Education and incentives must be included in this solution.

[Emphases supplied.]   The "other solutions" included traditional engineering solutions involving excavation.

74.     By April 9, 2001, the Task Force members had concluded that, notwithstanding the caveats about FDDs reported to the public in Task Force

Newsletter No. 4 and in presentations to the public on February 13 and 15, 2001, its "possible solution" to sanitary sewer backups was an all-FDD "city-wide" program.

75.     Later on April 9, 2001, the Task Force members made a presentation to the City Council to that effect, reporting that their "final recommendation" would be for a "Citywide FDD Program," that is, FDD construction for all homes with a connected footing drain system.

76.     In subsequent presentations and communications to the City Council through at least July 2001, the Task Force explained that the success of the implementation of the FDDP would require FDD construction on private property at the estimated 20,000 private homes with connected footing drain systems in the City of Ann Arbor.  This included Plaintiffs' pre-November 1973 homes that had been grandfathered in 1973 under Ordinance 8-73 against FDDs.

77.     On information and belief, even though then-City Attorney and Abigail Elias and then-Assistant City Attorney Thomas Blessing were aware of the provisions of Ordinance 8-73,  neither the Task Force nor the City Council were made aware of the grandfathering of homes in the five "problem areas" where the Plaintiffs' homes were located.

78.     Upon information and belief, MDEQ was not aware of the vested property rights created by Ordinance 8-73.

79.    On or about June 28, 2001, CDMI completed the final written report of the Task Force ("Task Force Report").  On July 9, 2001`, then-Water Utilities Director, Sue McCormick, forwarded the Task Force Report to the City Council.

80.    The Task Force Report's "Final Recommendation" (consistent with its communications to the City Council on April 9, 2001) was that the City "take action to remove rain and ground water inflow sources into the City sanitary sewer system by implementing a comprehensive city-wide footing drain disconnection program within the City of Ann Arbor"   contemplating the completion of FDDs in the aforesaid 20,000 homes, including the Plaintiffs' homes.

**E.    The Ordinance is Enacted**.

81.    On August 20, 2001, after presentations by City staff and review by City Attorney Elias about the proposed Footing Drain Disconnection Program and after receipt of the Task Force Report on July 9, 2001, the City passed the Ordinance as Ordinance No. 32-01, entitled "Program for Footing Drain Disconnect from POTW." (A copy of the Ordinance, codified as City of Ann Arbor Code of Ordinances Title II, Chapter 28, §2:51.1 and since amended in non-material respects to the matters in suit is attached hereto as **Exhibit "5"**)  The Ordinance served four main functions.

82.    First of all, the Ordinance declared "improper" all flows from the preexisting, required, lawful and long-standing connected footing drain systems as

to which vested property rights had been created by the City in the manner described in Paragraphs [13] to [22], supra, including those that had been expressly grandfathered by the City of Ann Arbor Ordinance No. 8-73.

83.    In that regard, the Ordinance authorized the Director of the Utility Department ("Director") for the City to order property owners within certain "target areas" (as designated by the Director) to correct "improper storm water inflows" from their property or face a monthly fine of One-Hundred Dollars ($100.00).

84.    The five "problem areas" for purposes of the Task Force were designated as the five "Target Areas" under the Ordinance.

85.    Second, the Ordinance allowed the Director to establish a list of private contractors approved to perform work under the program and established a protocol pursuant to which the homeowner would purportedly enter into a direct contractual relationship with a contractor and the City would not be a party.

86.    In fact, no such contracts were entered into by the Plaintiffs and the City paid its "approved" contractors directly for the "basic install" under its own arrangements with the contractors never disclosed by the City to homeowners.

87.    Third, the Ordinance authorized the City to make direct payments for a "basic install package" at a fixed maximum price, work subject to the discretion of the Director, provided, *inter alia*, that the homeowner selected one of only two

or three contractors offered by the City to the homeowner and designated by the City as "prequalified" or "approved."  The "pre-qualified contractor" system drove homeowners away from what should have been their own choice of contractors to those approved by the City.  The City handpicked approximately five contractors that it then "pre-qualified" in 2001 for work under the FDDP.  This included one company – Perimeter Engineering, LLC – that had been created at the behest of one or more employees of the City Water Utilities Department, approximately one year before such employee or employees left the City.  Before leaving to pursue work on FDDs as a business venture, one or more of such employees helped to implement the FDDP as government workers.

88.    Finally, the Ordinance made clear that the homeowner, and not the City, CDMI or the construction contractor, would be responsible in perpetuity for operating, maintaining and replacing all equipment and structures built and/or installed in the home under the FDDP, for an expressed public purpose, including labor for observation and complete responsibility for sump pumps, sump crocks, pipes, backups, drainage lines and other equipment; the furnishing of water and electricity; the purchase and installation of any backup systems; and all necessary repairs.

**F.     The City Was Aware that FDDs Were "Work on Private Property."**

89.     Before enactment, then-City Attorney Abigail Elias stated to the City Council in writing that (pursuant to Ann Arbor City Charter Section 5.2(a)(3)) she had reviewed the Ordinance for its legality.

90.     Nevertheless, the only fair reading of the Task Force Report, is that the Task Force members (including Water Utilities Director McCormick and the City Administrator, Roger Frazer) were concerned about mandatory physical entries and FDDs as "work on private property."

91.     The Task Force Report also reported on such concerns raised by Members of the City Council before enactment of the Ordinance.  The Task Force Report urged caution on the part of the City before any formal action was taken to implement the recommendations in the Report.

92.     For example, in Section I, entitled "*Additional Decision Influences,*" the following assessment was made:

> ***Work on Private Property Causes Concern*** *– For those homeowners that have previously had basement flooding, they generally said that work on their property (basement and lawn) would be acceptable.  **However, there were some affected homeowners who were very resistant to allowing any work to be performed.  There was also a general concern from unaffected homeowners regarding potential work on their property.***

[Emphasis added.] Later in the same section of the Report, the following concern was raised:

*Can the City Work on Private Property?* – *The option of footing drain disconnection was seen as a viable solution only if access to private property could be arranged.*

93.     This concern as to the legal basis for the recommended solution was expressed later in the Task Force Report, in Section L2, entitled *"Final Recommended Program,"* where the following question was raised:

*Legal Authority* – *Can and will the City of Ann Arbor have the legal framework to accomplish the work required on private property?*

The City Task Force recommended work on private property at 20,000 homes with no idea of the legality of such actions.

94.     State condemnation proceedings and payment of just compensation to homeowners *before* FDD construction was not mentioned in the Task Force Report as a "legal framework to accomplish the work required on private property" or in communications from the Task Force or from the City Attorney's Office to the City Council.

95.     In Section L3 of the Report (entitled *"Proposed Implementation Steps"*), the following affirmative statement appears:

*A first step is to develop a legal framework that would allow access and work on private property. To be effective, the City of Ann Arbor would need to have the power to accomplish the disconnection work on private property.*

96.     The City neither had nor could create "power to accomplish the disconnection work" for permanent physical occupations of the Plaintiffs' houses.

97.    On July 9, 2001, a City Council Working/Special Session ("Council Working Session") was held at which a quorum was present and the draft FDD ordinance was presented to the City Council by the City's staff and contractors. The Council Working Session was recorded on videotape.

98.    Former Ann Arbor Mayor John Hieftje asked Assistant City Attorney Blessing the following question:

> What are we going to do about the property owner who is very reluctant to take part in this program, who doesn't want anything to do with it, who thinks we are the sewer Nazis [and] doesn't want people working in their house?

99.    Mr. Blessing replied that the City would obtain administrative search warrants to enter the houses and conduct inspections and searches for FDD purposes. The City did not seek or obtain administrative search warrants for entry and search of the Plaintiffs' basements and other areas of the house.  The Plaintiffs were all told by CDMI and/or City personnel that the entry by these persons for purposes of the FDDP was "required," "mandatory," or similar terms.

**G.    The Invasion of the Plaintiffs' Homes by the City or its Agents Was Intentional and planned**

100.   The City created a pilot specification for Ann Arbor FDDs in 2000 and then, until at least 2012, the City, CDMI and committees and bodies on which both the City and CDMI sat, developed and/or disseminated the engineering and construction specifications and guidance for FDD construction at targeted houses.

101.    Those documents and others about the FDD construction process have consistently described the FDD construction in targeted houses, including the open occupation and destruction of residential real property, as including the following actions by the City, CDMI and/or its "pre-qualified" contractors:.

1.    Inspection and search of the home without warrant to find the location (in the basement or crawlspace area) of the cleanout (located inside the foundation wall) for the house's footing drains (located outside the foundation walls at footing level);

2.    For houses with footing drain cleanouts in a concrete basement location (as in the vast majority of cases, including Plaintiffs Yu and Lumbard), the next step was jackhammering through the original concrete foundation floor around the internal cleanout, followed by excavation of a sump pit approximately 36 inches in diameter and 42 inches deep;

3.    For houses with footing drain cleanouts (as in relatively few cases) in a crawlspace location, the next step was digging up undisturbed flooring material and excavation of a sump pit there approximately 36 inches in diameter and approximately 42 inches deep;

4.    Permanent construction within each sump pit of a sump crock approximately 18 to 24 inches in diameter;

5.    Installation of pipes for the drainage of foundation drain flows into the sump crock, which flows (before the FDD construction) had drained into the existing house combined sewer lateral;

6.    Penetration of the building envelope near street level for a 4-inch sump pump discharge pipe;

7.    Installation of an electrical sump pump in the sump crock for the purpose of elevating and discharging water collected in the sump crock, through the installed vertical and horizontal piping and including through the aforesaid

penetration of the building envelope, to the exterior of the house;

8.   Construction of an external drainage system for discharges from the sump pump, including a shallow drainage line below ground and across the owner's property for conveyance of such discharges from the exterior wall of the house across the property to the lawn extension;

9.   In the vast majority of cases, a tap performed by the City connecting such drain line to a specially designed, City-constructed and funded collector drain  horizontally drilled and installed by the City at shallow depth lengthwise in the lawn extension ("curb drain");

10.   At a relatively few houses (such as the home of Plaintiffs' Boyer and Raab), connection of the external drainage line drilled horizontally or trenched across the side or rear yard for drainage into a county storm water catch basin located off the premises of the homeowner.

102.   Upon information and belief, the owners of at least 1,834 homes in the City of Ann Arbor were required to submit to such FDD construction on their private property and inside their residences pursuant to the FDDP and continue their "corvée labor" for the City, under threat of legal process without pay, which labor the City mandates and accepts in violation of federal laws against forced labor.

103.   The City has detailed records which identify every home within Ann Arbor that have been subjected to FDD construction.

104.   Implementation of the "FDD Program" was selective and directed at Plaintiffs (such as the named Plaintiffs) based on their addresses.

105.   Upon information and belief, the vast majority of these homes (including the named Plaintiffs' homes) had not experienced sanitary or storm water backups before the Ordinance was enacted and the FDD Program was initiated.

106.   Every home where FDD construction was required was physically invaded and remains permanently and physically occupied by the City, as an unwanted tenant, to the extent of at least the construction, materials, pumps and other equipment, piping, wiring, fastening devices and other items permanently erected in, onto and around their private homes and such other extent that the taking is the Plaintiff's should prove.

107.   As a result of the FDD work performed by the City or its agents, the overwhelming majority of the affected homes now endure a stream of storm water and groundwater that has been rerouted from their pre-existing, lawful, external drainage to a stream of storm water and groundwater drainage into the interior of the homes, which now flows into sump crocks in the foundation floors on a regular basis.

108.   Whereas these owners, before FDD construction, could rely on gravity for storm water and ground water drainage, they have been, and are now, required since then to rely upon electrical pumps for elevation and discharge of such drainage and, therefore, are dependent upon an uninterrupted electrical supply

and are exposed to the attendant and constant risks of spring and/or winter flooding of the interiors of their homes during the daytime and nighttime alike.

## H.   The City Knew about the Potential for Pump Failures and Power Outages.

109.   During the Task Force process, many residents complained about the frequency of power failures during rain storms in the areas to be initially targeted under the FDD Program and that they would be helpless against storm water and ground water if the footing drains had been disconnected and the electricity to power their sump pumps went out.

110.   In an apparent attempt to address these concerns, in Section L.1.3 of the Task Force Report the task force unanimously recommended, the following:

> **Backup Sump Pump –** This should be funded in all homes. Either a water powered or battery powered option should be made available.

111.   Upon information and belief, although the Task Force Report containing the beneficial recommendation for a backup pump set forth above was widely disseminated and was available online, the decision to reject these recommendations was neither disseminated nor disclosed to the public.   Upon information and belief, no newsletters or other communications were published with this information; it was not discussed at public meetings that were held; and no other efforts were made by the Task Force or the City following the issuance of the Report to publicize the efforts which had been taken to eliminate or reduce

protections which the Report recommended be made available to the targeted homes.

112.   By July 9, 2001, however, City Staff and the Task Force questioned the need for a backup sump pump (electric or hydraulic) and its cost.   At the Council Working Session that day, then-Mayor Hieftje stated that providing backups to residents with FDDs would be "above and beyond" what the owners needed or deserved.

113.   Plaintiff Lynn Lumbard purchased a battery backup, with a recharging station, at her own cost.   Some owners, such as Plaintiff Anita Yu, have gone without backups due to expense or lack of knowledge of the risk of pump failure. Others, like Plaintiffs' John Boyer and Mary Raab have spent from over $500 to over $1,000 for a hydraulic backup.   The hydraulic backup runs on City water, for which the homeowner has to pay.

## I.     The City was Aware of the Freezing and Backup Risk from FDD "Curb Drains."

114.   In the overwhelming majority of FDD installations (including that of Plaintiff Lynn Lumbard), sump pump discharges are conveyed upward and out of the house through a perforation in the building envelope at shallow depth well above the Michigan frost line of 42" depth.

115.   Sump pump discharge water then travelled through a "storm water lateral," installed at shallow depth above the 42-inch Michigan frost line, to the lawn extension in front of the houses (the area between the sidewalk and the curb).

116.   In the lawn extensions, the City had drilled and constructed special "curb drains" for FDD installations, at shallow depths well above the 42-inch Michigan frost line, to collect the sump pump discharges and direct them to a ground-level catch basin.

117.   After enactment of the Ordinance, the FAQs posted online by the City included FAQ 27 about freezing of external drainage lines:

> [Question] What happens if the discharge line freezes in the winter or is broken?
>
> [Answer]   It is possible for the discharge lines to freeze **as they are installed above the frost line.**   Normally, the water discharged from the sump pump is warm enough to flow without freezing to the storm drainage system.   Additionally it is a cyclic flow which means it flows very fast while the pump is operating and hardly at all when not.   This means that if the lines [are] placed with the proper grade they should not contain water for an extended period of time therefore minimizing possible freezing.   If it does freeze, there is an emergency discharge near the home that allows water to be pumped outside the house.  . . .   In these cases, the emergency discharge would put the sump water next to the house until the homeowner can repair the line.

[Emphasis added.]

118.   On or about March 1, 2014, the curb drain in front of Plaintiff Lynn Lumbard's home froze solid, causing an invasion of her house by water, causing drainage and expansion, all as completely foreseen by the City.

119.   The same curb drain froze solid again in March 2015.

120.   After having mandated that Plaintiff Lumbard abandon her as-designed and as-built footing drain systems for storm-water to a combined sewer lateral under her house and then to the City's combined sewer, the City's design called for connection of the new discharge at or just above ground level to a City-owned and City-controlled curb drain in the lawn extension, specifically designed and installed for discharges from homes where FDD construction had been performed, on which Plaintiff Lumbard was completely dependent for the discharge of storm water exiting her house as sump pump discharge.

121.   By choosing to design and mandate connection to a system of external drainage consisting of pipes that convey water far above the Michigan frost line the City with certain knowledge of freezing and backup potential into Plaintiff Lumbard's home, the City included periodic flooding of Plaintiff Lumbard's home as an element of its public purpose for the FDDP.

122.   The City responded to urgent calls by Plaintiff Lumbard to the City after she discovered the existence of the curb drain and the that the City had connected her discharge line to it, by sending a contractor for the City, Greg

Marker, PE, who made detailed observations in a report to the City dated April 3, 2014 about the occurrence of the frozen "curb drain" collector, its causes, the process of freezing in the external drain lines and the curb drains, and the steps over a period of days needed for a crew of workers to clear the curb drain so Plaintiff Lumbard could resume drainage of storm water from her house.

123.   Mr. Marker observed that the depth of the external drain line under Plaintiff Lumbard's yard, of the curb drain in the lawn extension, and the depth of the connection between such line and such collector were between 18 and [24] inches above the 42 inch Michigan frost line, as aforesaid.

## J.   Owners Were Coerced Into Compliance with the FDD Program

124.   The removal of footing drain flows under the FDDP was never intended to be voluntary.  In fact, in the City's recent iteration of its "Homeowner Information Packet" (v8.4 8/8/2013), the City included the following item in the "Frequently Asked Questions" section of its recently-closed website:

*Legal Requirements*

[Question:] May I choose not to participate in the program? What are the consequences of that?

[Answer:]   *Participation in this program is mandated by city ordinance*.  The FDD program offers Homeowners the opportunity to have the City pay for installation if the work is completed within the schedule of the program.  If the homeowner does not comply with the notices to arrange disconnection, a surcharge of $100 per month will be charged to the homeowner for the additional costs associated with handling un-metered footing drain flows into the sewer system.

Disconnection is still required and if done after the 90 day notice expires, the disconnection work will no longer be paid by the city.

[Emphasis added.]

125.   The "pre-qualified contractor" system drove homeowners away from their own choice of contractors to those approved by the City.

126.   The City handpicked approximately five contractors that it then "pre-qualified" in 2001 for work under the FDDP.  This included one company— Perimeter, Engineering, LLC--that had been created at the behest of one or more employees of the City Water Utilities Department, approximately one year before such employee or employees left the City.  Before leaving to pursue work on FDDs as a business venture, one or more of such employees helped to implement the FDDP as government workers.

## CLASS ACTION ALLEGATIONS

127.   Plaintiffs move this Court to enter an order certifying this cause as a Class Action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

128.   Plaintiffs, Lynn Lumbard, Anita Yu, John Boyer and Mary Raab, bring this class action on behalf of themselves and the following class of similarly situated persons: all homeowners within the City of Ann Arbor whose one-family and two-family homes were permitted before January 15, 1974 and were subjected to mandatory FDD's pursuant to the Ordinance ("the Takings Class").

## A.  Certification under Rule 23.

129.  This action satisfies the numerosity, commonality, typicality and adequacy requirements of Fed. R. Civ. P. 23(a) and the requirements of Fed. R. Civ. P. 23(b)(3) militate in favor of a class certification in this case.

130.  Fed. R. Civ. P. establishes five threshold requirements for class certification:

> (a) The class is so numerous the joinder of all members is impracticable;
>
> (b) There are questions of law or fact common to the class;
>
> (c) The claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (d) The representative parties will fairly and adequately assert and protect the interests of the class;

## B.  The Takings Class Meets the Requirements for Class Certification.

131.  The Takings Class satisfies the numerosity standards.  The Class is believed to exceed 3,000 persons ("Members") in Washtenaw County, Michigan. Joinder of all Takings Class Members in a single action is impracticable and unwieldy.  Takings Class Members may be kept informed of the status of the matter and important developments by published and broadcast notice, through direct mail and/or through the use of a password accessible website.

132.  There are questions of fact and law common to the Takings Class which predominate over any questions affecting individual members.    The

questions of law and fact common to the Class arising out of the City's actions include, but are not limited to, the following:

(a)  Whether the City was prohibited from implementing an ordinance that impaired or destroyed the Members' vested property rights;

(b)  Whether the City's actions in implementing the Ordinance resulted in takings without just compensation paid or secured in advance in violation of the Fifth Amendment to the United States Constitution;

(c)  Whether the City's actions in FDD construction constitutes physical takings by permanent physical occupations under *Loretto v. Teleprompter Manhattan CATV*, 459 U.S. 419 (1982);

(d)  Whether FDDs are continuing takings;

(e)  Whether FDDs have stabilized as takings or can every stabilize;

(f)  Whether the FDD's performed at the Takings Class Members' properties has caused or will cause property values to decrease;

(g)  Whether the City's actions in implementing the FDD Program at the Class Members' residences have stigmatized those properties, further affecting the properties' values;

(h)   Whether the City should be required to permit Class Members to reconnect the Class Members' footing drains to the City's sewage system and to remove the sump pits, sump pumps and other equipment installed by the City or its agents in the Class Members' homes;

(i)  Whether the City should be enjoined from continuing to take property pursuant to the Ordinance;

      (j)    Whether the FDD construction at Takings Class Members houses are partial or complete takings; and

      (k)    Whether the mandate of labor under the Ordinance is "forced labor" under federal statutes including 18 U.S.C. 1589(a)(3).

133.   The questions set forth above predominate over any questions affecting only individual persons and a Class Action is superior with respect to considerations of judicial economy, efficiency, fairness and equity, to other available methods for the fair and efficient adjudication of this controversy.

134.   The claims of the class representatives are typical of the claims of the class as the FDD's of the class members were all undertaken pursuant to the Ordinance and the policies and procedures employed by the City and its authorized agents to implement the Ordinance and most of the after-effects of FDD construction city-wide are shown in the houses of the class representatives.

135.   The class representatives will fairly and adequately represent the class.  The Plaintiffs, Lynn Lumbard, Anita Yu, John Boyer and Mary Raab are adequate representatives of the Takings Class because they are members of the proposed Takings Class and their interests do not conflict with the interests of the members of the Class they seek to represent.  Together they have been litigating the legality of the FDDP since as early as 2014.  The interests of the members of the Takings Class will be fairly and adequately protected by the Plaintiffs and their

counsel, who have extensive experience prosecuting litigation against the City over the City's FDD program, in particular. Counsel for the Plaintiffs also have investigated the FDDP for over five years including depositions of City officials and employees involved in this case and have extensive background materials concerning the Ann Arbor FDDP.

136. A class action is, by far, the most appropriate method for the fair and efficient adjudication of this controversy. The City has not acknowledged that the FDDP results in any physical invasion or occupation or otherwise results in a taking. The presentation of separate actions could create a risk of inconsistent and varying determinations on the merits, establish incompatible standards of conduct for the City and/or make it more difficult for the Takings Class Members to vindicate their rights.

137. Maintenance of this action as a class action is a fair and efficient method for the adjudication of this controversy. It would be impracticable and undesirable for each member of the Takings Class who suffered harm to bring a separate action. In addition, the maintenance of separate actions would place an undue burden on the courts and run the risk of inconsistent determinations.

## THE PLAINTIFFS' CLAIMS

138. Because the Plaintiffs' homes were constructed in conformity with the then-applicable City Code provisions, building codes, and other relevant standards

and the Plaintiffs or their predecessors-in-title received building permits, Certificates of Occupancy and/or other necessary approvals from the City, the Plaintiffs and all Takings Class Members acquired vested rights to their footing drain connections to their house combined sewer laterals and of the combined sewer lateral to the combined sewer and to the use and occupations of the existing construction of their home before the FDD construction at their homes.

139.   The Ordinance was enacted by the City in order to facilitate a solution to long-standing and self-created conditions in the least expensive and/or most expedient way possible, rather than proven engineering solutions, such as combined sewer separation.

140.   The mandatory disconnection of the Plaintiffs' footing drains and the forced installation of sump crocks, sump pumps, pipes, wiring, electrical connections, external drainage lines and related equipment constituted a physical invasion by the City, or others acting on its behalf or in its stead, resulting in a permanent physical occupation of the Plaintiffs' property and a *per se* taking, ousting the Takings Class Plaintiffs from their exclusive use and occupation of their property.

141.   To save money, the City surreptitiously withdrew benefits that had been recommended by the Task Force appointed to evaluate available solutions to the perceived basement backup problem, such as backup sump pumps and pre- and

post-FDD radon testing with mitigation for those homes with documented increased radon levels, benefits which were publicized to the residents of Ann Arbor.

142.  Moreover, the mandatory ongoing and perpetual responsibilities imposed on present and future owners for the observation, inspection, operation, repair and maintenance of the pumps and related equipment represent an unreasonable financial and personal burden upon the Plaintiffs' use and enjoyment of their property; constitute "forced labor" as defined by 18 USC §1589(a)(3); are a legal burden running with the land;  and represent an inappropriate delegation by the City to its citizens of its governmental obligations pertaining to the capacity, maintenance and operation of the City's sewage system.

143.  The City's public use and occupation of Plaintiffs' homes contemplated the resulting cost savings from mandatory labor.

144.  The City has authority under the Ordinance to enforce such requirements.

145.  The Plaintiffs, Lynn Lumbard, Anita Yu, John Boyer and Mary Raab and all other Takings Class Members have been forced to incur costs and expenses. As a direct result of the FDD construction at their homes and will continue to incur such costs and expenses in the future.  The City's public use of Plaintiffs' home

contemplates that the incurrence of such costs and expenses will be perpetual, yielding significant savings to the City in implementing the FDDP.

146.   Whereas Plaintiffs, Lynn Lumbard, Anita Yu, John Boyer and Mary Raab, and all other Takings Class Members previously enjoyed the peace of mind and repose which comes from having dry basements and no water problems, they have, since the implementation of the FDDP, experienced the ongoing burdens of mandatory labor and expense associated with the observation, maintenance and operation of the FDD components, water and/dampness problems or the fear thereof and, in general, the diminution in their quality of life as homeowners attributable to the FDDP.

147.   The physical invasion and occupation of the Plaintiffs' properties deprive them of the incidents of ownership as they have lost the full bundle of rights that accompany ownership of real property, including, but not limited to, the ability to control the property and what is placed in and upon it and the right to exclude others.

## RIPENESS

148.   The Plaintiffs, Lynn Lumbard, Anita Yu, John Boyer and Mary Raab have used the procedures provided under the laws of the State of Michigan to challenge the inverse condemnation of their properties in State Court and have been denied just compensation.

**A. Yu, Boyer and Raab Action.**

149.   On or about February 24, 2014, Plaintiffs, Anita Yu, John Boyer and Mary Raab, ("the Yu Plaintiffs") commenced an action against the City in the 22nd Circuit Court, County of Washtenaw, Michigan with Case Number 14-181-CC, under the caption: "Anita Yu, John Boyer and Mary Raab v. City of Ann Arbor." The summons and complaint was served upon the City on March 7, 2014.

150.   On March 17, 2017, 2014, the City removed the action to the United States District Court for the Eastern District of Michigan (Southern Division) by filing a Notice of Removal and Supporting Petition which asserted that this Court had jurisdiction over the action based upon federal questions jurisdiction under 28 U.S.C. §1331.  Supplemental jurisdiction over the state court claims was asserted under 28 U.S.C. §1367(a).  The Docket in that removal proceeding can be found under Case No. 2:14-cv-11129-AC-MKM.

151.   On March 24, 2014, the City filed a motion to dismiss for failure to state claims upon which relief may be granted and for lack of subject matter jurisdiction.

152.   On April 3, 2014, the Yu Plaintiffs filed a motion to remand pursuant to 28 U.S.C §1447(c) on the grounds that their claims were not ripe in federal court under the *Williamson* doctrine as enunciated by the United States Supreme Court in *Williamson County Regional Planning Comm. v. Hamilton,* 473 U.S. 172

(1985), as interpreted by the decisions of the Sixth United States Circuit Court of Appeals at that time.  On May 28, 2014, the Court, Hon. Avern Cohn, USDCJ presiding, granted the motion to remand and the matter was sent back to Washtenaw County Circuit Court in Ann Arbor.

153.   On September 12, 2014, the Yu Plaintiffs filed a Notice of *England* Reservation with the Clerk of the Washtenaw County Circuit Court.  With this *England* Reservation, the Yu Plaintiffs reserved their rights to pursue all claims arising under the laws and constitution of the United States of America, including all claims arising under the Fifth and Fourteenth Amendments to the United States Constitution.  (A copy of the Yu Plaintiff's Notice of England Reservation is attached as **Exhibit "6").**

154.   On June 9, 2014, the City filed a motion for summary disposition under MCR 2.116(C)(7) and (C)(8), which was heard on November 20, 2014.  This motion under MCR 2.116(C)(8) was denied, the Court noting that the complaint 'adequately stated a claim" and the motion under 2.116(C)(8), based upon the statute of limitations was denied without prejudice

155.   On December 26, 2014, the Yu Plaintiffs filed their first amended complaint which contained a single cause of action under Article 10, Section 2 of the Michigan Constitution of 1963.  In October of 2014, an order on consent had been entered, dismissing without prejudice the Yu Plaintiffs' federal claims.

156.   On or about December 10, 2015, the City filed a motion for summary disposition under MCR 2.116(C)(10), arguing that there was no taking because the Yu Plaintiffs "owned" the FDD installations and, therefore, did not suffer any physical invasion or occupation.  On January 15, 2016, an order was signed and entered, granting the City's motion.

**B. The Lumbard Class Action.**

157.   On October 30, 2015, Plaintiff, Lynn Lumbard, on her own behalf and on behalf of a putative class of persons similarly situated, commenced an action against the City in the 22nd Circuit Court, County of Washtenaw, Michigan with Case Number 15-1100-CC, under the caption: "Lynn Lumbard, individually and on behalf of all others similarly situated v. City of Ann Arbor" ("the Class Action").  The summons and complaint was served upon the City on the date the action was commenced.

158.   On September 12, 2014, a Notice of *England* Reservation was filed with the Clerk of the Washtenaw County Circuit Court in the Class Action. (A copy of the Notice of *England* Reservation in the Class Action is attached as **Exhibit "7"**).  With this *England* Reservation, Lynn Lumbard, on her own behalf and on behalf of the putative class reserved their rights to pursue all claims arising under the laws and constitution of the United States of America, including all

claims arising under the Fifth and Fourteenth Amendments to the United States Constitution.

159.   On or about February 11, 2016, the City filed a motion for summary disposition under MCR 2.116(C)(10), arguing that there was no taking because Lynn Lumbard "owned" the FDD installations and, therefore, did not suffer any physical invasion or occupation.  On March 31, 2016, an order was signed and entered, granting the City's motion.

160.   In its order, the Court granted the City's motion and dismissed the Class Action with prejudice "[f]or the same reasons Defendant City of Ann Arbor's motion was granted in Yu, et al vs. City of Ann Arbor, Case No. 14-181-CC (Circuit Court for Washtenaw County), which was heard and granted on January 7, 2016, and as otherwise stated on the record in this case."

**C. Appeal to the Michigan Court of Appeals.**

161.   Plaintiffs, Lynn Lumbard, Anita Yu, John Boyer and Mary Raab timely appealed the orders, dismissing their respective cases, to the Michigan Court of Appeals.  The appeals were later consolidated on consent.  By decision dated May 9, 2017, the Court of Appeals affirmed the lower court orders in both cases.

162.   In its opinion, the Court of Appeals ruled that with respect to all the plaintiffs in the consolidated appeal, "there was no taking by permanent physical

occupation in this case because plaintiffs owned the installations on their properties."

163.   Upon information and belief, all class members who might seek just compensation under the procedures available in the State of Michigan courts would have their individual claims dismissed based upon the reasoning employed by the Michigan Court of Appeals.

164.   Plaintiffs, Lynn Lumbard, Anita Yu, John Boyer and Mary Raab have satisfied the requirements of *Williamson* and the takings claims being advanced in this class action are now ripe for adjudication in federal court.

165.   With respect to any additional plaintiffs other than Lynn Lumbard, Anita Yu, John Boyer and Mary Raab, it would be futile for them to seek a remedy for the actual physical takings of their property in State Court.  The Ordinance makes no provisions for any due process rights.

**FIRST CAUSE OF ACTION**
***FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION***

166.   Plaintiffs repeat and re-allege Paragraphs "1" through "165", as if more fully set forth herein.

167.   The Fifth Amendment to the United States Constitution provides, in pertinent part, that private property shall not be taken for public use without due process and just compensation.

168.   The City's implementation and enforcement of the Ordinance has directly and particularly resulted in the taking of the Plaintiffs' properties without due process or just compensation.

169.   As a result of the foregoing, the Plaintiffs and the other Takings Class Members are entitled to due process and just compensation.

## SECOND CAUSE OF ACTION
### 42 U.S.C. SECTION 1983

170.   Plaintiffs repeat and reallege Paragraphs "1" through "169" as if more fully set forth herein.

171.   The City is a "person" subject to liability under 42 U.S.C. Section 1983 for violating the federally protected rights of others.

172.   The implementation and enforcement of the Ordinance by the City of Ann Arbor, particularly and directly against the Plaintiffs and their homes, has resulted in the violation of the Plaintiffs' federally protected rights, to wit, their right not to have their primary residences taken without just compensation or due process and their right to be free from mandatory work and physical labor under the Ordinance solely for the supposed benefit of others without pay or protection of law.

173.   The implementation and enforcement of the Ordinance by the City constitutes *per se* takings of the Plaintiffs' properties by actual direct or physical

invasion and actual, permanent physical occupation without due process or just compensation and the imposition of requirements for non-paid, non-volunteer mandatory work and physical labor essential to the City's public use and obtained by threats of legal process as set forth in the Ordinance in violation of 18 U.S.C. §1589(a)(3).

174.   Without the cost savings to the City achieved by the use of forced labor performed by FDD homeowners and the payment by them of all expenses of their performance, the FDDP would not have been viable.

175.   As a result of the foregoing, the Plaintiffs and the other Takings Class Members are entitled to due process and just compensation, including payment for their work, physical labor and the expenses they have incurred as contemplated by the City for purposes of cost savings.

**THIRD CAUSE OF ACTION**
***INJUNCTIVE RELIEF***

176.   Plaintiffs repeat and re-allege Paragraphs "1" through "175" as if more fully set forth herein.

177.   The Plaintiffs and the other Class Members have no adequate remedy at law.

178.   In the absence of injunctive relief in conjunction with an award of just compensation, the Plaintiffs and the other Class Members will continue to (1)

endure the physical invasion and physical occupation of their property, (2) assume ongoing and perpetual responsibility for the operation and maintenance of the sump pumps and related equipment installed in their homes for the supposed benefit of others without pay, a responsibility that is an unrecorded burden running with the land on future owners, in violation of 18 USC §1589(a)(3); and (3) bear a financial and personal burden upon their exclusive use and enjoyment of their homes.

179.   As a result, the Plaintiffs and the other Class Members are entitled to injunctive relief, restraining and enjoining the City, its agents, representatives and employees, and all others acting on its behalf or in its stead from taking any further steps to implement or enforce the ordinance as to them.

180.   In conjunction with an award of just compensation, the Plaintiffs and other Class Members are entitled to injunctive relief, requiring the City to permit Class Members to reverse, correct and remedy the effects of the unconstitutional taking.

## FOURTH CAUSE OF ACTION
### *DECLARATORY RELIEF*

181.   Plaintiffs repeat and re-allege Paragraphs "1" through "180" as if more fully set forth herein.

182.   The Plaintiffs and other Class Members are entitled to a judgment declaring (1) that the Ordinance has been unconstitutionally implemented and includes the use of mandated labor in violation of federal law; (2) that the implementation of the Ordinance has improperly resulted in takings of  private property without just compensation therefor; (3) that the Ordinance has improperly allowed for such takings without condemnation proceedings under Michigan law; and (4) the relative rights and responsibilities of the parties.

## FIFTH CAUSE OF ACTION
### *ATTORNEYS FEES*

183.   Plaintiffs repeat and re-allege paragraphs "1" through "182" as if more fully set forth herein.

184.   As a result of the facts and circumstances of this matter, the Plaintiffs and other Class members are entitled to reasonable attorneys' fees as allowed by law.

**WHEREFORE**, the Plaintiffs respectfully request judgment as follows:

A.      Certification of the proposed Class under Rule 3.501 of the Michigan Court Rules;

B.      On their first cause of action, due process and just compensation as required by the Fifth Amendment to the United States Constitution

C.      On their second cause of action, due process and just compensation as and for payment for their work, physical labor and the expenses they have incurred under 42 U.S.C. § 1983;

D.      On their third cause of action, preliminary and permanent injunctive relief, restraining the City, its agents, representatives and employees and all others acting on its behalf or in its stead from taking any other further steps to implement, or enforce the FDD Ordinance as to them and granting such other injunctive relief as to the Court may seem just and proper.

E.      On their fourth cause of action, a declaration that the City of Ann Arbor's FDDP ordinance is unconstitutional under the United States Constitution as implemented and further declaring the relative rights and responsibilities of the parties;

F.      On their fifth cause of action, reasonable attorneys' fees as allowed by law;

G.      Such other and further relief as the Court may deem just and proper; and

H.      The costs and disbursements of this action.

Respectfully submitted,

Dated:  October 20, 2017        By:  _____

**DONALD W. O'BRIEN, JR.** (P1417492)
**WOODS OVIATT GILMAN LLP**
Attorney for Plaintiffs
700 Crossroads Building
2 State Street
Rochester, New York 14614
585.987.2800
dobrien@woodsoviatt.com


**IRVIN A. MERMELSTEIN** (P52053)
Attorney for Plaintiffs
2099 Ascot Road
Ann Arbor, MI 48103
(734) 717-0383
nrglaw@gmail.com